HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

Fairhaven Health, LLC,

       Plaintiff,

    v.

BioOrigyn, LLC, Joanna Ellington, aka
Joanna Clifton, and Dennis Clifton

       Defendants.

Case No.  2:19-cv-01860-RAJ

ORDER

## I.   INTRODUCTION

Before the Court are three motions.  Having considered the submissions of the parties, the relevant portions of the record, and the applicable law, the Court finds that oral argument is unnecessary.  For the reasons below, Defendants' Motion to Dismiss or, in the Alternative, Motion for a More Definite Statement, and Motion for Partial Summary Judgment (Dkt. # 46) is **GRANTED in part** and **DENIED in part**, and the parties' motions to seal (Dkt. ## 60, 67) are **GRANTED**.

## II.   BACKGROUND

In late 2014 and early 2015, two businesses entered four agreements.  Under those agreements, one business, BioOrigyn, was supposed to develop products for the other, Fairhaven.  Broadly speaking, Fairhaven was supposed to buy a license to some of BioOrigyn's intellectual property.  And, using that intellectual property, BioOrigyn was supposed to develop products for Fairhaven.  Four years later, in 2019, the relationship

ORDER – 1

between the businesses soured, giving rise to this litigation.  The center of their dispute: who owned the products and intellectual property that BioOrigyn developed, did BioOrigyn make any misrepresentations before the parties entered the agreements, and were the agreements breached or void?

Plaintiff Fairhaven Health LLC ("Fairhaven") offers "natural, doctor-designed products" to support fertility, pregnancy, breastfeeding, and overall women's health. Dkt. # 40 ¶ 17.  To bring new products to market, Fairhaven consults research scientists and physicians.  *Id.* ¶ 18.  One such consultant was Defendant BioOrigyn LLC ("BioOrigyn").  *Id.*

Fairhaven and BioOrigyn's relationship began in or around 2003.[1]  Dkt. # 68 at 33 (¶ 5).  At the time, BioOrigyn offered a fertility lubricant product known as "Pre-Seed," which Fairhaven bought wholesale and distributed through its website.  *Id.*

In 2012, nearly a decade later, BioOrigyn sold Pre-Seed to another company.  Dkt. # 62 ¶ 10.  And Fairhaven continued to distribute Pre-Seed with the other company.  *Id.* ¶ 11.

## A.      2014 Collaboration

The story of this dispute begins in 2014.  In the summer and fall of that year, the parties contemplated a new partnership.  Dkt. # 62 ¶¶ 13-23; Dkt. # 68 ¶¶ 13-30.  Each remembers the formation and intended scope of that partnership differently.

According to BioOrigyn, at the time, it had certain intellectual property rights to an "arabinogalactan patent family."  Dkt. # 62 ¶ 9.  It often referred to those rights as the "401 patents" or the "401 technology."  *Id.*  BioOrigyn contemplated licensing those rights to Fairhaven.  *Id.* ¶¶ 15, 17.  Then, using the 401 technology, BioOrigyn would develop a "potential vaginal fertility drug" among other products for Fairhaven.  *Id.*

---

[1] At the time, BioOrigyn was doing business as "INGFertility."  Dkt. # 68 ¶ 5.  For purposes of this order, the Court will not distinguish between the entities and will refer to either as BioOrigyn.

ORDER – 2

¶¶ 15, 17.  But from the beginning, BioOrigyn says, it represented to Fairhaven that it could not help Fairhaven develop a "fertility lubricant."  *See, e.g.*, *id.* ¶¶ 15, 16, 20.

Fairhaven, on the other hand, has a different account.  It says that it sought to engage BioOrigyn as a consultant.  Dkt. # 68 at 36 (¶¶ 14-15).  Fairhaven intended to retain BioOrigyn to design, develop, patent, and market new Fairhaven products.  *Id.* Specifically, Fairhaven sought BioOrigyn's help to develop a "menopause lubricant" and a "fertility lubricant with a drug claim."  *Id.*  The parties further contemplated the development of "a fertility lubricant, pregnancy/birth lubricant, menopause lubricant, mucus product with drug claim, ultrasound gel, and douche/rinse."  *Id.* at 37 (¶ 18).

In late 2014, the parties consummated their partnership through three agreements: the 2014 Consulting Agreement, the 2014 License Agreement, and the 2014 Asset Purchase Agreement (together, the "2014 Agreements").  Under the 2014 License Agreement, BioOrigyn licensed its rights to the 401 patents to Fairhaven.  Dkt. # 39 Ex. D.  And under the 2014 Asset Purchase Agreement, BioOrigyn sold a trademark to Fairhaven.  Dkt. # 40 ¶ 46; Dkt. # 62 ¶ 19.  BioOrigyn describes these three agreements as "inter-related"; Fairhaven describes them as "a confounding web."  Dkt. # 40 ¶ 46; Dkt. # 62 ¶ 15.

Apparently, under these agreements, BioOrigyn would grant Fairhaven a license to the 401 patents (the 2014 License Agreement).  Using those patents, BioOrigyn would develop products for Fairhaven (the 2014 Consulting Agreement).  And Fairhaven would advertise those products under the IsoLove trademark that it bought from BioOrigyn (the 2014 Asset Purchase Agreement).  *See, e.g.*, Dkt. # 47-1 at 16-17; Dkt. # 53 at 39-41; Dkt. # 63-2 at 1-3.

### B.    Invention Disclosure Form

The parties entered the 2014 Agreements in late 2014.  The 2014 Consulting Agreement was executed on October 15.  Dkt. # 39 Ex. C.  Explained in more detail below, under the consulting agreement, the rights to certain BioOrigyn creations created

ORDER – 3

1   under the agreement would be assigned to Fairhaven.  Dkt. # 39 at 79 (§ 5(b)).

2   In December 2014, more than a month after executing the 2014 Consulting

3   Agreement, BioOrigyn concluded that it could, in fact, develop a fertility lubricant for

4   Fairhaven.  Dkt. # 62 ¶¶ 50-64.[2]  BioOrigyn then notified Fairhaven of a new invention.

5   Dkt. # 62-1 at 55-56.  To summarize the invention and its underlying technology,

6   BioOrigyn drafted an "invention disclosure form," or "IDF."  Dkt. # 62 ¶ 60.

7   Initially, however, BioOrigyn did not share that IDF with Fairhaven.  Dkt. # 62-1

8   at 55-56.  It believed that the technology described in the IDF was not covered by the

9   2014 Agreements.[3]  *Id.*; Dkt. # 62 ¶¶ 57-66.  It also believed that the IDF technology

10  contained "very novel recipes and formulation[s]."  Dkt. # 62-1 at 55-56.  Given that,

11  BioOrigyn asked Fairhaven to sign a new license agreement to the IDF technology before

12  BioOrigyn disclosed it.  *Id.*; Dkt. # 62 ¶¶ 57-66.  Ultimately, in January 2015, BioOrigyn

13  disclosed the IDF to Fairhaven, who agreed to buy a license to the IDF technology.  Dkt.

14  # 39 Ex. B; Dkt. # 63-8.

15  **C.    Procedural History**

16  In 2019, nearly five years later, Fairhaven sued BioOrigyn.  Dkt. # 1.  In short,

17  Fairhaven alleges that BioOrigyn made several misrepresentations during the parties'

18  2014 and 2015 contract negotiations.

19  For one thing, Fairhaven alleges that it owned the IDF technology from the start.

20  Dkt. # 40 ¶¶ 83-86.  It alleges that BioOrigyn developed the IDF technology under the

21  2014 Consulting Agreement, and thus any of BioOrigyn's intellectual property rights to

22  the IDF technology were assigned to Fairhaven under that agreement.  *Id.*  Because

---

[2] Initially, BioOrigyn believed that it could not develop a fertility lubricant for Fairhaven because of a "non-compete" obligation with another entity.  Dkt. # 62 ¶ 59.  The Court has sealed information about that obligation.  For more context, see Docket No. 47 paras. 50-59.

[3] The Court refers to the technology disclosed in the IDF (the "novel non-toxic isotonic gels") simply as the "IDF technology."  Dkt. # 47-1 at 165-168.

ORDER – 4

BioOrigyn misrepresented that the IDF technology belonged to it and not Fairhaven, Fairhaven alleges that BioOrigyn breached the 2014 Consulting Agreement and that the 2015 License Agreement is void. *Id.* ¶¶ 94-194.

On January 24, 2020, BioOrigyn moved to dismiss Fairhaven's complaint. Dkt. # 18. The Court granted that motion in part and denied it in part. Dkt. # 37. The Court also granted leave to amend. *Id.*

Fairhaven later amended its complaint. Dkt. ## 39, 40. And BioOrigyn moved to dismiss again. Dkt # 46. It also moved, in the alternative, for partial summary judgment. *Id.* BioOrigyn's motion is ripe and now before the Court.

### III.   LEGAL STANDARDS

#### A.   Federal Rule of Civil Procedure 12

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for failure to state a claim. The court must assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from those allegations. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). The court "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Instead, the plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007). If the plaintiff succeeds, the complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief. *Id*. at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On a motion to dismiss, a court typically considers only the contents of the complaint. However, a court is permitted to take judicial notice of facts that are incorporated by reference in the complaint. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials documents attached to the complaint, documents incorporated by reference in the complaint."); *Mir v. Little Co. of*

ORDER – 5

*Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988) ("[I]t is proper for the district court to 'take judicial notice of matters of public record outside the pleadings' and consider them for purposes of the motion to dismiss.") (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)).

## B.    Federal Rule of Civil Procedure 56

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial to defeat the motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

## IV.   DISCUSSION

BioOrigyn's dispositive motion has two parts, a motion to dismiss under Rule 12(b)(6) and a motion for summary judgment under Rule 56.  Dkt. # 61.  The Court addresses each part in turn.  Before that, the Court briefly addresses the parties' motions to seal.

## A.    Motions to Seal (Dkt. ## 60, 67)

In a previous order, the Court denied without prejudice the parties' unopposed

ORDER – 6

motions to seal.  Dkt. # 59.  The Court agreed that the documents requested to be sealed were confidential and proprietary.  *Id.*  But it denied the motions because, as presented, they did not meet the "compelling reasons" sealing standard.  *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).  The parties failed to explain what injury would result if the documents are not sealed or why a less restrictive alternative would be insufficient.  Dkt. # 59.

Since then, the parties have refiled their motions to seal.  Dkt. ## 60, 67.  They have revised their motions and pared their sealing requests.  *Id.*  They have also publicly refiled many documents or portions of documents that were previously filed under seal.  Dkt. ## 61-62, 64-65, 68.  The Court has reviewed the parties' submissions and determines that they have remedied the deficiencies of their previous sealing motions.  The Court finds compelling reasons for the currently sealed documents to remain so.  Dkt. ## 39, 46-47, 52-56, 63, 66.

**B.    Motion to Dismiss**

BioOrigyn moved to dismiss once before.  Dkt. # 18.  The Court later granted that motion in part and denied it in part and granted Fairhaven leave to amend.  Dkt. # 37.  Fairhaven amended its complaint, and BioOrigyn again moved to dismiss.  Dkt. ## 39-40, 46.  BioOrigyn's instant motion advances three arguments.  Dkt. # 61 at 10-20.

First, BioOrigyn challenges Fairhaven's new breach allegations.  *Id.* at 11-14.  In amending its complaint, Fairhaven added new allegations, alleging yet more ways that Fairhaven breached the 2014 Consulting Agreement.  Dkt. # 40 ¶¶ 71-72, 99.  BioOrigyn says that these new breach theories are unsupported by factual allegations.  Dkt. # 61 at 11-13.

Second, BioOrigyn remakes a previous argument.  Dkt. # 61 at 14-19.  In its first motion to dismiss, BioOrigyn argued that all of Fairhaven's fraud claims must fail.  Dkt. # 32 at 13.  BioOrigyn argued that none of its alleged misrepresentations were representations of "an existing fact" and thus no fraud claim could obtain.  *Id.*  The Court

ORDER – 7

was not persuaded.  Dkt. # 37 at 17-18.  Now, in its second motion to dismiss, BioOrigyn tries its "presently existing fact" argument again.  This time, however, its argument is more robust.  Dkt. # 61 at 14-19.

Third, BioOrigyn attacks the sufficiency of Fairhaven's good faith and fair dealing claim, a claim that this Court previously dismissed with leave to amend.  Dkt. # 61 at 19-20.  The Court addresses each argument in turn.

### i.  Fairhaven's New Breach Allegations

#### (1) Partial Dismissal of a Claim

Rule 12(b)(6) permits a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12.  It may be used "to dismiss some or all of a pleading."  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010); *see also Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003) ("Dismissal of a complaint *or part of a complaint* under Rule 12(b)(6) is reviewed de novo." (emphasis added)).  Undecided, however, is whether Rule 12(b)(6) may be used to dismiss certain factual allegations within a complaint.  *Thompson v. Paul*, 657 F. Supp. 2d 1113, 1129 (D. Ariz. 2009) ("The Court is unaware, however, of any situation in which a Rule 12(b)(6) motion may be used to strike certain allegations in support of a claim, where the underlying claim itself is not challenged.").

District courts in this circuit have held that Rule 12(b)(6) may not be so used.  *Thompson*, 657 F. Supp. 2d at 1129; *Snell v. G4S Secure Sols. (USA) Inc.*, 424 F. Supp. 3d 892, 904 (E.D. Cal. 2019) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." (quoting *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015)) (collecting cases); *Franklin v. Midwest Recovery Sys., LLC*, No. 8:18-cv-02085-SB-DFM, 2020 WL 3213676, at *1 (C.D. Cal. Mar. 9, 2020) ("Federal Rule of Civil Procedure 12(b)(6) does not provide a mechanism for dismissing only a portion of a claim.") (collecting cases).

ORDER – 8

Some of these courts have held that, rather than a Rule 12(b)(6) motion to dismiss, the appropriate mechanism to challenge specific allegations within a complaint is a Rule 12(f) motion to strike. *Hightower v. JPMorgan Chase Bank*, N.A., No. 2:11-cv-01802-PSG-PLA, 2012 WL 12878311, at *3 (C.D. Cal. Sept. 12, 2012) ("Because Defendant moves to dismiss only specific allegations supporting Plaintiffs' claims and not any of the claims themselves, the motion should have been brought as a motion to strike pursuant to Rule 12(f)."); *see also Thompson*, 657 F. Supp. 2d at 1129 ("[I]n such situations, the challenge must be brought pursuant to Rule 12(f).").

Casting some doubt on that approach, however, is the Ninth Circuit's decision in *Whittlestone, Inc. v. Handi-Craft Co.* There, a defendant moved to strike a plaintiff's claim for lost profits and consequential damages because such damages were precluded as a matter of law. 618 F.3d at 973-74. The defendant brought its motion under Rule 12(f). *Id.* The Ninth Circuit rejected that approach: defendant's motion, it held, "was really an attempt to have certain portions of [the] complaint dismissed"—"actions better suited for a Rule 12(b)(6) motion." *Id.*

> Were we to read Rule 12(f) in a manner that allowed litigants to use it as a means to dismiss some or all of a pleading . . ., we would be creating redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion . . . already serves such a purpose.

*Id.*; *see also Aliya Medcare Fin., LLC v. Nickell*, No. 2:14-cv-07806-VAP-E, 2015 WL 11072180, at *19 (C.D. Cal. Sept. 25, 2015).

Despite *Whittlestone*, which does not squarely address the issue here, the Court joins its sister district courts: Rule 12(b)(6) may not be used to challenge specific allegations in a complaint; Rule 12(f) is the proper mechanism.

### (2) Paragraphs 71, 72, and 99 of the Amended Complaint

Previously, BioOrigyn moved to dismiss Fairhaven's breach of contract claim. Dkt. # 18 at 21-22. The Court rejected that motion, holding that Fairhaven adequately

ORDER – 9

stated a claim.  Dkt. # 37 at 14-16.

In amending its complaint, Fairhaven added more breach allegations.  Dkt. # 40 ¶¶ 71-72, 99.  Fairhaven now claims that BioOrigyn breached even more provisions of the 2014 Consulting Agreement.  *Id.*  For example, Fairhaven now claims, "[o]n information and belief," that BioOrigyn violated the agreement by "failing to disclose" possible inventions made by BioOrigyn and by "disclosing" or "transferring rights" to "third parties."  *Id.* ¶ 99.  Fairhaven alleges that these actions violated Sections 5(b), 5(c), and 6(a) of the 2014 Consulting Agreement.  *Id.*

BioOrigyn argues that Fairhaven's new allegations are conclusory and legally insufficient.  Dkt. # 61 at 11-13.  It advances its arguments under Rule 12(b)(6).  *Id.* at 10-11.  And it seeks to dismiss Fairhaven's "new theories" of breach.  Dkt. # 46-1 at 2. Yet it does not seek to dismiss Fairhaven's breach of contract claim entirely.  *See id.*

The Court denies BioOrigyn's motion because it is procedurally improper. BioOrigyn is using a Rule 12(b)(6) motion not to attack an entire claim but the legal sufficiency of certain allegations within that claim.  That is not what Rule 12(b)(6) is for. Instead, BioOrigyn should have brought this as a motion to strike under Rule 12(f).  The Court will not construe the instant motion as such and denies BioOrigyn's Rule 12(b)(6) motion accordingly.

## ii.    Presently Existing Fact

Under Rule 12(g), a party that makes a motion under Rule 12 "must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  Fed. R. Civ. P. 12.  Thus, "a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6)."  *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper*, 139 S. Ct. 1514 (U.S. 2019).  Instead, "[i]f a failure-to-state-a-claim defense under Rule 12(b)(6) [is] not asserted in the first motion to dismiss under Rule 12," then the defense

can "only" be raised in a Rule 7 pleading, a Rule 12(c) motion, or at trial. *Id.* at 318. [4]

Here, BioOrigyn raises new arguments that it could have raised before but did not. Previously, in its first Rule 12(b)(6) motion to dismiss, BioOrigyn challenged Fairhaven's fraud-based claims. Dkt. # 32 at 13. All of Fairhaven's fraud claims, BioOrigyn argued, fail because Fairhaven failed to allege a representation of "presently existing fact." *Id.* The Court rejected that argument. Dkt. # 37 at 17-18.

Now, in its second Rule 12(b)(6) motion to dismiss, BioOrigyn tries that argument again. Dkt. # 61 at 14-19. But this time its presently-existing-fact argument is much more robust. *Id.* Once just a paragraph long, the argument now spans five pages. *Compare* Dkt. # 32 at 13 *with* Dkt. # 61 at 14-19.

The Court finds, however, that these new arguments were "available" to BioOrigyn before but were merely "omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). BioOrigyn's failure to include these arguments in its previous Rule 12(b)(6) motion makes these arguments late, and BioOrigyn is precluded from raising them in its instant, second Rule 12(b)(6) motion. Thus, given Rule 12(g)(2), the Court rejects and does not consider BioOrigyn's new presently-existing-fact argument. Dkt. # 61 at 14-19.

### iii.   Good Faith and Fair Dealing (Count 9)

"There is in every contract an implied duty of good faith and fair dealing," which "obligates the parties to cooperate with each other so that each may obtain the full benefit

---

[4] In *In re Apple iPhone*, the Ninth Circuit explained that a district court that mistakenly entertains a "late-filed Rule 12(b)(6)" motion could "generally be forgiv[en]." 846 F.3d at 319. The *In re Apple iPhone* court explained that sometimes there is "practical wisdom" in entertaining late-filed Rule 12(b)(6) motions because not doing so could "produce unnecessary and costly delays." *Id.* Though it said that it would be *forgiving* of a district court's mistake, the Ninth Circuit "far from *require[d]* a district court to consider a successive Rule 12(b)(6) motion." *Harrell v. City of Gilroy*, No. 5:17-cv-05204-LHK, 2019 WL 452039, at *8 (N.D. Cal. Feb. 5, 2019) (emphasis added); *see also Sagastume v. Psychemedics Corp.*, No. 2:20-cv-06624-DSF-GJS, 2021 WL 3932299, at *3 n.2 (C.D. Cal. Feb. 16, 2021) ("Although district courts have discretion in this area, the Court believes the best approach is not to consider arguments that violate Rule 12(g) in the first place.").

ORDER – 11

of performance." *Badgett v. Sec. State Bank*, 807 P.2d 356 (Wash. 1991).  "[T]he duty arises only in connection with terms agreed to by the parties." *Id.*; *see also Donald B. Murphy Contractors, Inc. v. King Cty.*, 49 P.3d 912 (Wash. Ct. App. 2002) ("A duty of good faith and fair dealing is deemed to exist in every contract, but it arises only in connection with the performance of specific contract obligations. If no contractual duty exists, there is nothing that must be performed in good faith.").

The duty arises "when the contract gives one party discretionary authority to determine a contract term." *Rekhter v. State, Dep't of Soc. & Health Servs.*, 323 P.3d 1036, 1041 (Wash. 2014) (quoting *Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 935 P.2d 628 (Wash. Ct. App. 1997)).  The duty "limits the authority of a party retaining discretion to interpret contract terms" but does not "provide a blank check for that party to define terms however it chooses." *Id.* (emphasis omitted) (quoting *Scribner v. Worldcom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001)).

Fairhaven claims that BioOrigyn violated its duty of good faith and fair dealing. Dkt. # 40 ¶¶ 174-87.  Fairhaven says that this duty, attached to all contracts, attached to the 2014 Consulting Agreement and to the 2014 Licensing Agreement.  *Id.*  At bottom, Fairhaven alleges that BioOrigyn breached this duty by "frustrating the purpose" of the agreements.  *See, e.g.*, *id.* ¶¶ 182, 183, 186.

For example, under the 2014 Consulting Agreement, certain "Inventions" created by BioOrigyn were assigned to Fairhaven.  Dkt. # 39 at 79 (§ 5(b), (c)); Dkt. # 40 ¶¶ 60-63.  Fairhaven alleges that BioOrigyn "frustrate[d]" that provision in many ways.  Dkt. # 40 ¶ 183.  One way was when BioOrigyn represented to Fairhaven that a certain "Invention" belonged to BioOrigyn when, according to Fairhaven, the "Invention" in fact belonged to Fairhaven.  *Id.*  Another way was when BioOrigyn misled Fairhaven into entering the separate and unnecessary 2015 License Agreement.  *Id.*  As to the 2014 Licensing Agreement, Fairhaven makes similar "frustrating the purpose" allegations. *See, e.g.*, *id.* ¶ 186 ("Defendants frustrated the purpose of the 2014 License Agreement by

designing and formulating BabyIt products that did not fall within the scope of the 401 patents . . . and thus never received the contracted-for protection of those 401 patents . . . .").

Fairhaven's "frustration of the purpose" theory fails; these allegations are insufficient to state a good faith and fair dealing claim.  Surely, Fairhaven identifies specific contractual provisions, satisfying one element of a good faith and fair dealing claim.  But it falls short because none of those provisions are discretionary.  Fairhaven has not identified a term in the 2014 Consulting Agreement or 2014 License Agreement giving one party "discretionary authority to determine a contract term." *Rekhter*, 323 P.3d at 1041.  Fairhaven identifies no provision in the agreements giving BioOrigyn discretion to set a future contract term.  If there were such a provision, then *that* provision would be governed by an implied covenant of good faith and fair dealing. *Rekhter*, 323 P.3d at 1042 ("[W]hen a party has discretion over a future contract term, it has an implied duty of good faith and fair dealing in setting and performing that contractual term.").  Absent such a provision, there is no implied duty of good faith and fair dealing that BioOrigyn could have breached, and Fairhaven's claim fails.

The Court **DISMISSES** Count 9 of the Amended Complaint.  Dkt. # 40 ¶¶ 174-87.

### C.     Motion for Summary Judgment

Having addressed BioOrigyn's motion to dismiss, the Court now turns to BioOrigyn's motion for summary judgment.  The motion is disorganized and requires some explaining.

Apparently, BioOrigyn seeks summary judgment on several claims.  Dkt. # 61 at 20-22.  These claims include breach of the 2014 Consulting Agreement (Count 1), fraudulent inducement (Count 6), negligent misrepresentation (Count 7), unjust enrichment (Count 8), breach of the implied covenant of good faith and fair dealing (Count 9), and declaratory judgment (Count 10).  Curiously, however, BioOrigyn does

ORDER – 13

not address the elements of these claims individually.  Dkt. # 61 at 27-29.  Instead, it makes a global challenge: it challenges the claims' "underlying predicate."  *Id.* at 27.  That is, through this motion for summary judgment, BioOrigyn challenges the truth of certain key allegations in the Amended Complaint, allegations that underlie several claims.

The Court first explains what exactly is the "underlying predicate" that BioOrigyn challenges.  Once it does so, the Court then addresses—what should by then be clear—the core, threshold issue raised on summary judgment: who owned the "novel non-toxic isotonic gels" that BioOrigyn invented in late 2014?  The Court ultimately concludes that this issue raises several factual questions, making summary judgment improper.

### i.  Underlying Predicate

In its Amended Complaint, Fairhaven alleges the following:  In about 2003, Fairhaven and BioOrigyn began doing business together.  Dkt. # 40 ¶ 22.  At the time, Fairhaven distributed one of BioOrigyn's products.  *Id.*  More than a decade later, in 2014, the parties began discussing a new business collaboration.  *Id.* ¶ 33.

The intended scope of that collaboration is unclear.  Apparently, in the summer of 2014, the parties conceived that BioOrigyn would develop new products for Fairhaven.  *Id.* ¶ 33.  These products included a "non-fertility lubricant," a "menopausal lubricant," a "fertility lubricant with [a] drug claim," a "pregnancy/birth lubricant," a "douche/rinse product," and more.  *Id.* ¶¶ 33, 36, 39.  After some initial discussions, Fairhaven formally retained BioOrigyn as a consultant.  *Id.* ¶ 40.  To that end, on October 15, 2014, the parties entered the 2014 Consulting Agreement.  *Id.*

That agreement contained several provisions relevant here.  One provision explained that all "Inventions"[5] that BioOrigyn created under the agreement would

---

[5] Unless otherwise stated, when the Court uses the capitalized term "Invention," it refers to the definition of "Invention" set forth in Section 5(b) of the 2014 Consulting Agreement.  Dkt. # 39 at 79.

ORDER – 14

belong to Fairhaven and that BioOrigyn would assign all its rights to such "Inventions" to Fairhaven. *Id.* ¶ 63. "Invention" was a defined term under the agreement. *Id.* ¶ 62.

About two months after the parties entered the 2014 Consulting Agreement, BioOrigyn notified Fairhaven that it developed a new technology. *Id.* ¶ 73. BioOrigyn created an "invention disclosure form," or an "IDF." *Id.* That IDF was, supposedly, intended to notify Fairhaven of a new invention. *Id.* ¶¶ 73-74. Broadly, the IDF concerned "novel non-toxic isotonic gels." *Id.* ¶ 76.

BioOrigyn, however, maintained that BioOrigyn—not Fairhaven—was the owner of the IDF technology. Assuming that BioOrigyn, in fact, owned the IDF technology, Fairhaven agreed to buy a license to that technology. *Id.* ¶ 83. In January 2015, just about three months after the parties entered the 2014 Consulting Agreement, the parties entered another agreement. *Id.* Under that agreement, the 2015 License Agreement, BioOrigyn bought a license to the IDF technology. *Id.*

Now, Fairhaven believes that it owned the IDF technology from the start. *Id.* ¶ 83. In its complaint, Fairhaven alleges that it owned the IDF technology all along because such technology was an "Invention" under the 2014 Consulting Agreement. *Id.* Thus, Fairhaven alleges that BioOrigyn—by claiming to be the owner of the IDF technology and by deceiving Fairhaven into entering the 2015 License Agreement—committed fraud and breached the 2014 Consulting Agreement. *See, e.g.*, *id.* ¶¶ 57-58, 84.

That allegation is the "underlying predicate" that BioOrigyn now attacks. Moving for summary judgment, BioOrigyn argues that the underlying predicate is wrong. According to BioOrigyn, in 2014, it indeed owned the IDF technology as it represented to Fairhaven. Dkt. # 61 at 21. Thus, BioOrigyn argues that its representations were true, it did not breach the 2014 Consulting Agreement, and it did not make any misrepresentations as to the 2015 License Agreement.

### ii.   Issue on Summary Judgment

Fundamentally, then, the issue raised by BioOrigyn's motion for summary

ORDER – 15

judgment is, under the 2014 Consulting Agreement, who owned the IDF technology?  If BioOrigyn owned the IDF technology, then presumably many of Fairhaven's claims would fail.  For example, if BioOrigyn owned the IDF technology, as it represented in 2014, Fairhaven's fraud-based claims might fail.  In that case, BioOrigyn's alleged misrepresentations would not have been misrepresentations at all; they would have been true.  Conversely, if Fairhaven owned the IDF technology, as it alleges in its complaint, then presumably many of its claims would survive.

Hence, the ownership of the IDF technology might affect the disposition of several claims.  In any event, the Court need not cross that bridge just yet.  Who owns the IDF technology raises factual issues that the Court cannot resolve on summary judgment.

The Court's analysis has four parts.  First, the Court sets forth Washington's contract interpretation law.  Next, the Court identifies the relevant portions of the 2014 Consulting Agreement.  The Court then explains the history of the IDF.  Finally, the Court determines whether the IDF technology is an "Invention" under the 2014 Consulting Agreement.

### iii.   Contract Interpretation

"[T]he touchstone of the interpretation of contracts is the intent of the parties." *Scott Galvanizing, Inc. v. Nw. EnviroServices, Inc.*, 844 P.2d 428, 432 (Wash. 1993). "[A] court's primary goal is to ascertain the parties' intent at the time they executed the contract."  *Int'l Marine Underwriters v. ABCD Marine, LLC*, 313 P.3d 395, 399 (Wash. 2013).

In interpreting contracts, Washington follows the "objective manifestation theory." *Singh v. Am. Honda Fin. Corp.*, 925 F.3d 1053, 1072 (9th Cir. 2019) (quoting *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005)).  Under that theory, courts determine the parties' intent by focusing on an agreement's "objective manifestations," not the parties "unexpressed subjective intent."  *Hearst*, 115 P.3d at 267. Courts determine intent by the "reasonable meaning of the words used" in an agreement.

ORDER – 16

*Id.*

Washington also follows the "context rule." *Id.* at 266 (citing *Berg v. Hudesman*, 801 P.2d 222, 229 (Wash. 1990)). Under that rule, "extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent." *Berg*, 801 P.2d at 229. Such evidence is admissible regardless of whether the contract is ambiguous. *Id.* at 230. Extrinsic evidence, however, is to be used to "determine the meaning of *specific words and terms used*" and not to "show an intention independent of the instrument or to vary, contradict or modify the written word." *Hearst*, 115 P.3d at 267 (emphasis in original) (internal quotation marks omitted) (quoting *Hollis v. Garwall, Inc.*, 974 P.2d 836 (Wash. 1999)).

### iv.   2014 Consulting Agreement

On October 15, 2014, Fairhaven and BioOrigyn entered the 2014 Consulting Agreement. Dkt. # 39 at 78. Under the agreement, Fairhaven retained BioOrigyn to "render consulting and advisory services." *Id.* Specifically, BioOrigyn was to provide "Services," a term that was supposed to be defined in Exhibit A to the agreement. *Id.* Yet, through error or otherwise, Exhibit A did not define the term "Services." *Id.* at 86.

Several provisions of the 2014 Consulting Agreement are relevant here. These provisions address the disclosure and ownership of "Inventions" that BioOrigyn created under the agreement. Section 5(b) describes BioOrigyn's duty to notify Fairhaven of its "Inventions." Dkt. # 39 at 79. Section 5(c) explains who owns those "Inventions." *Id.*

Section 5(b) has two functions. It identifies which BioOrigyn creations are considered "Inventions" under the agreement. And it imposes a duty on BioOrigyn to notify Fairhaven of such "Inventions."

> (b) *Notification and Disclosure.* [BioOrigyn] shall promptly notify [Fairhaven] in writing of the existence and nature of, and shall promptly and fully disclose to [Fairhaven], any and all ideas, designs, practices, processes, formulas, apparatus, software, code, methods, improvements and inventions that [BioOrigyn] has conceived or first actually reduced to practice and/or may conceive or first actually reduce to practice during the

ORDER – 17

> Term or which [BioOrigyn] may conceive or reduce to practice within six months after the Term, if such ideas, designs, practices, processes, formulas, apparatus, software, code, methods, improvements and inventions (i) were developed on any [of Fairhaven's] time during the performance of any Services, (ii) were made using any [of Fairhaven's] equipment, supplies or facilities, (iii) were the result of access to, or rely upon or incorporate, any [of Fairhaven's] technology, trade secret or confidential information or (iv) otherwise relates directly to [Fairhaven]'s proprietary lubricant technology or its application or to [Fairhaven]'s actual or demonstrably anticipated research or development (any and all of which are hereinafter referred to as "*Inventions*").

Dkt. # 39 at 79 (§ 5(b)).  Put simply, then, a BioOrigyn creation is an "Invention" under the agreement if BioOrigyn conceived (or may have conceived) it during the agreement term (or six months thereafter) *and* if the creation falls within *any* one of the four categories above.  *Id.*  Further, BioOrigyn must notify Fairhaven of any "Inventions" that it creates.  *Id.*

On the other hand, Section 5(c) identifies who owns the "Inventions."  Dkt. # 39 at 79.  That subsection provides that all "Inventions" belong to Fairhaven and that BioOrigyn assigns all rights to such "Inventions" to Fairhaven.  *Id.*

> (c) *Ownership of Inventions*. (i) Subject to Section 5(d) below, all Inventions shall be the sole and exclusive property of [Fairhaven] . . ., and . . . [BioOrigyn] hereby assigns to [Fairhaven] all of its right, title and interest in and to any and all such Inventions.

*Id.* (§ 5(c))

**v.    Invention Disclosure Form**

Shortly after the parties entered the 2014 Consulting Agreement, BioOrigyn notified Fairhaven that it developed a novel technology, encapsulated in an "IDF."  Dkt. # 62 ¶¶ 60, 63.  The technology in that IDF was for "novel non-toxic isotonic gels."  Dkt. # 63-8.

Specifically, the IDF explained that ███████████████████████ ███████████████████████████████████████ together with ███████████████

ORDER – 18

███████████████████ could address deficiencies of then-existing ████████

████████ *Id.* at 3.  To that end, the IDF disclosed an invention ████████████

████████████████████████████████████████

████████████████████████████████████████

*Id.* The ██████████████ would be █████████████████████████

██████ *Id.* The IDF also identified the ingredients to that novel non-toxic isotonic gel.

*Id.* at 3-4.

On January 5, 2015, more than two months after the parties entered the 2014 Consulting Agreement, BioOrigyn finally disclosed the IDF to Fairhaven.  Dkt. # 62 ¶ 63.  The IDF technology later served as the foundation for several patents and products. *Id.*; Dkt. # 68 at 42-43.

### vi.  Section 5(b)(iv) – Actual or Demonstrably Anticipated Research or Development

The Court begins with what is not in dispute.  Neither party objects to Section 5(c) of the 2014 Consulting Agreement.  If the IDF technology is properly considered an "Invention" under the agreement, then Fairhaven would presumably own that technology under Section 5(c).  Further, neither party contends that the IDF technology was conceived outside the term of the agreement (or six months thereafter).  Finally, neither party disputes that the IDF technology is an "idea," "design," "formula," or "invention" under Section 5(b).  Dkt. # 39 at 79.

Hence, all that remains is whether the IDF technology is an "Invention," as defined by Section 5(b).  It is an "Invention" if it falls within any one of the section's four subsections: it was (i) developed on Fairhaven's time during the performance of any "Services"; (ii) made using any of Fairhaven's equipment, supplies, or facilities; (iii)  the result of access to, or reliance upon, Fairhaven's technology, trade secret, or confidential information; or (iv)  directly related to Fairhaven's "proprietary lubricant technology" or to Fairhaven's "actual or demonstrably anticipated research or development."  Dkt. # 39

ORDER – 19

at 79.

Analyzing this issue, the Court keeps in mind the parties' respective summary judgment burdens. BioOrigyn, as the moving party, may prevail on summary judgment by merely pointing to an absence of evidence to support Fairhaven's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Fairhaven, in turn, can defeat summary judgment by setting forth specific facts showing that there is a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Court finds that Fairhaven has met its summary judgment burden. A reasonable trier of fact could conclude that the IDF technology is an "Invention" under Section 5(b)(iv).

To be sure, Fairhaven offers no evidence to show that the IDF technology is an "Invention" under Section 5(b)(ii) or 5(b)(iii). Fairhaven has not raised any facts showing that the IDF technology was made using Fairhaven's equipment, supplies, or facilities. *See* Dkt. # 68 at 24-25. Nor has it raised any facts showing that the IDF was a result of BioOrigyn's access to Fairhaven's technology, trade secret, or confidential information. *Id.* Thus, the IDF technology is not an "Invention" under these subsections.

Fairhaven also offers no evidence to show that the IDF technology is an "Invention" under part one of Section 5(b)(iv). Section 5(b)(iv) has two parts. Dkt. # 39 at 79. One part covers BioOrigyn creations related to Fairhaven's "proprietary lubricant technology." *Id.* On this front, Fairhaven offers no evidence to show that it had such proprietary technology when the contract was executed, never mind that the IDF technology related to such technology. Dkt. # 68 at 25. To that extent, Section 5(b)(iv) does not apply.

Turning to the second part of Section 5(b)(iv), however, the Court finds a triable issue of fact. Fairhaven has raised evidence showing that the IDF technology related to its "actual or demonstrably anticipated research or development." Dkt. # 39 at 79. According to Fairhaven, since late 2012 through at least October 2014, it worked with a

ORDER – 20

"third party scientist," hoping "to develop a fertility lubricant in paraben-free and potentially paraben-containing versions." Dkt. # 68 at 34-36, 40.  Fairhaven also began researching "antioxidants for potential use with a sperm-friendly lubricant" and began developing a "male fertility test."  *Id.*

Drawing all inferences in Fairhaven's favor, the Court concludes that a reasonable trier of fact could conclude that Fairhaven's research with the third-party scientist was "actual" or, at the very least, "demonstrably anticipated" when the parties entered the 2014 Consulting Agreement.  Dkt. # 39 at 79 (§ 5(b)).  The trier of fact could also conclude that such research "relate[d] directly to" the IDF technology given that both contemplate a non-toxic gel of some kind and that the IDF, broadly written, covers an array of technology.  *Id.*  Taken together, the trier of fact could reasonably conclude that the IDF technology was an "Invention" under Section 5(b)(iv).  *Id.*  Because reasonable minds could disagree, this issue is unfit for summary judgment.

### vii.    Section 5(b)(i) – Services

BioOrigyn's attack on the "underlying predicate" rests on a different subsection, Section 5(b)(i).  BioOrigyn's argument proceeds as follows:  Under Section 5(b)(i), a BioOrigyn creation is an "Invention" if it was developed on Fairhaven's time, during BioOrigyn's performance of any "Services."  Dkt. # 39 at 79.  The term "Services," BioOrigyn concedes, is not defined by the 2014 Consulting Agreement.  Dkt. # 61 at 9.  BioOrigyn attributes that to error.  *Id.*  It says that "[d]ue to an apparent error in completing the agreed upon version for execution, the parties signed a redlined version of the consulting agreement that was missing the agreed upon definition for 'Services.'"  *Id.*  Still, it argues, there is a proper definition of "Services," found in an earlier draft of the 2014 Consulting Agreement.  *Id.*  It says that this draft definition and the parties' prior dealings reveal that the parties intended for "Services" to exclude the development of "fertility lubricants."  *Id.* at 22-25; *see also* Dkt. # 62 ¶¶ 21-23.  Because the IDF technology is a "fertility lubricant," and because the development of "fertility lubricants"

ORDER – 21

was not a "Service" under the 2014 Consulting Agreement, the IDF technology could not be an "Invention" under Section 5(b)(i). Dkt. # 61 at 26-29. Therefore, the "underlying predicate" for several claims is false. *See id.*

This argument fails for two reasons. First, and perhaps most importantly, it ignores Section 5(b)'s other subsections. As discussed above, a BioOrigyn creation can be an "Invention" if it falls within *any* one of Section 5(b)'s four categories. BioOrigyn's argument here addresses only the first, Section 5(b)(i). Yet, even if BioOrigyn's Section 5(b)(i) argument were true, Fairhaven has still raised a triable issue of fact under another, independent subsection, Section 5(b)(iv). *See supra* Section IV.C.vi. Hence, even if the Court adopted BioOrigyn's proposed interpretation of the 2014 Consulting Agreement, summary judgment would be improper for this independent reason.

Second, under BioOrigyn's approach, factual issues abound. BioOrigyn's argument relies on extrinsic evidence to define the term "Services." It indeed offers credible evidence suggesting that the parties intended for the IDF technology not to be covered by the 2014 Consulting Agreement and that the omission of the "Services" definition was an accident. Dkt. # 62 ¶¶ 18-23.

But, for its part, Fairhaven raises evidence suggesting that the omission of a "Services" definition was intentional. Fairhaven says that it did not agree to the definition of "Services" contained in earlier drafts. Dkt. # 68 at 39-40. Nor would it have, Fairhaven says, because its "development interests and planned consulting efforts with BioOrigyn" were broader than BioOrigyn's earlier proposed definition. *Id.* For example, the proposed definition did not even mention "the specific formulation and development work" that Fairhaven specifically discussed with BioOrigyn, such as the development of a "menopause lubricant." *Id.*

Given this conflicting testimony, what the parties intended when they entered the 2014 Consulting Agreement is a question of fact. "Contract interpretation is a question of fact when a court relies on inferences drawn from extrinsic evidence." *Kelley v.*

*Tonda*, 393 P.3d 824, 830 (Wash. Ct. App. 2017). "[S]ummary judgment is inappropriate when more than one reasonable inference can be drawn from the extrinsic evidence." *Id.*; *see also Berg v. Hudesman*, 801 P.2d 222, 229 (Wash. 1990) ("A question of interpretation . . . is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.").

The parties' extrinsic evidence leaves the Court with two reasonable inferences. If the Court believes BioOrigyn, then the parties intended for the 2014 Consulting Agreement to exclude fertility lubricants. If the Court believes Fairhaven, then no such limitation exists. Both sides put forth credible evidence that the Court cannot weigh on summary judgment.

What is more, even if the Court adopted BioOrigyn's interpretation of "Services," factual issues would remain. Throughout its brief, BioOrigyn insists that the technology contained in the IDF is for "fertility lubricants." *See* Dkt. # 61 at 20-31. But that is not obviously true. The language of the IDF is broad and indeed does not even mention "fertility lubricants." Dkt. # 63-8. Thus, were the Court to adopt BioOrigyn's interpretation, it would still be left with a factual question: are the "novel non-toxic isotonic gels" disclosed in the IDF, in fact, "fertility lubricants"? This issue also makes summary judgment improper.

In sum, BioOrigyn's motion for summary judgment fails for a few independent reasons. Section 5(b)(i) aside, Fairhaven has raised a triable issue of fact as to whether the IDF technology is an "Invention" under Section 5(b)(iv). Separately, whether the parties intended to omit the definition of "Services" from the 2014 Consulting Agreement is a factual issue. Finally, even if the Court interpreted the 2014 Consulting Agreement as BioOrigyn wishes, a factual issue would remain as to whether the IDF technology included "fertility lubricants."

/ / /

ORDER – 23

# V.   CONCLUSION

For the reasons stated above, the Court **GRANTS in part and DENIES in part** Defendants' Motion to Dismiss or, in the Alternative, Motion for a More Definite Statement, and Motion for Partial Summary Judgment (Dkt. # 46) and **GRANTS** the parties' motions to seal (Dkt. ## 60, 67).

DATED this 17th day of December, 2021.

_____
The Honorable Richard A. Jones
United States District Judge

ORDER – 24